## IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF KENTUCKY

**UNITED STATES OF AMERICA**,

        Plaintiff,

    v.

**JOSEPHINE CROWE**,

        Defendant.

Case No.: 3:19-cr-00095-JHM-1

## DEFENDANT'S URGENT MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)

# DOCUMENT PROPOSED
# FOR FILING UNDER SEAL

# INTRODUCTION[1]

Josephine Crowe is a first-time, non-violent offender housed in a minimum-security federal prison in Lexington, Kentucky. She suffers from obesity, hypertension, asthma, and atrial fibrillation—all conditions that increase the risk of death or serious illness from COVID-19, the infectious disease caused by the SARS-CoV-2 coronavirus. Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, Pub. L. 115-391, this Court should reduce Ms. Crowe's sentence and convert her remaining time to supervised release for three reasons:

*First*, continued incarceration threatens Ms. Crowe's life and health. The prison environment is a tinderbox for infectious disease, including COVID-19. And Ms. Crowe is particularly vulnerable to the ravages of COVID-19; the Centers for Disease Control (CDC) has concluded that people, like Ms. Crowe, with obesity, respiratory disorders, and heart conditions are more likely to suffer dire consequences from the virus. Those terrifying consequences are not just death—patients who survive the virus are often left with long-term lung scarring, organ damage, and other severe health problems.[2] The threat to Ms. Crowe's life and health is an extraordinary and compelling reason to reduce her sentence.

*Second*, Ms. Crowe poses no danger to the public. Her crimes—financial institution fraud and aggravated identity theft—were not violent. And strict conditions of release will prevent her from reoffending. Moreover, Ms. Crowe is no career criminal. To the contrary, she had zero

---

[1] With permission from the author, parts of this brief are taken from the movant's Motion to Reduce Sentence in *United States v. Shehee*, No. 18-cr-6005 (E.D. Wash. Aug. 7, 2020), ECF No. 115.

[2] *See, e.g.*, Panagis Galiatsatos, M.D., *What Coronavirus Does to the Lungs*, Johns Hopkins Medicine (Apr. 13, 2020), https://bit.ly/31BFBHA; *see also* Heather Chen, *New Study Finds That Recovered COVID Patients in Wuhan Suffered Long-Term Lung Damage*, Vice (Aug. 7, 2020), https://bit.ly/3icdTrs ("[Dr. Peng Zhiyoung]'s research found that after nearly three months, 90% of those patients who survived severe cases of COVID-19 were left with debilitating lung damage.").

criminal history prior to the instant offenses and has committed no infractions while incarcerated. Ms. Crowe also promptly accepted responsibility for her crimes by entering a guilty plea, thereby demonstrating her remorse and resolve to reform.

*Third*, the sentencing factors favor reducing Ms. Crowe's sentence. If the Court converts Ms. Crowe's remaining time to supervised release, she will not be fully free after a sentence reduction. Rather, she will be governed by "conditions that substantially restrict [her] liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). Moreover, as even the U.S. Department of Justice ("DOJ") acknowledges, lengthy prison sentences serve no deterrent purpose.[3]

While Ms. Crowe's crimes were serious, they do not merit a death sentence. This Court should allow her to shelter in place in the safety of her home.

## BACKGROUND

### A.     Ms. Crowe is a first-time, non-violent offender.

The offense conduct is undoubtedly serious. While serving as the Vice President of the Louisville Metro Police Officer's Credit Union, Ms. Crowe "devised and executed a scheme to steal cash from the Credit Union's vault and teller drawers, to transfer Credit Union funds into accounts belonging to herself and certain of her family members, and to make payments on certain unwitting Credit Union members' loans with Credit Union funds that did not belong to the members for whose benefit they were credited." Dkt. 10 at 2 (Plea Agreement). Over the course of four years, Ms. Crowe misappropriated over $3 million. *Id.* at 2–3. The Credit Union, which was rendered insolvent as a result of Ms. Crowe's conduct, was liquidated by the National Credit Union Association. *Id.* at 3.

---

[3] Nat'l Inst. of Just., *Five Things About Deterrence* (June 5, 2016), https://bit.ly/2XA9g2s ("Sending an individual convicted of crime to prison isn't a very effective way to deter crime." And "[r]esearch shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.").

Ms. Crowe pled guilty to (1) one count of financial institution fraud, in violation of 18 U.S.C. § 1344; and (2) one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). *See* Dkt. 23 at 1–2 (Order of Judgment). She was sentenced to 132 months' imprisonment and ordered to pay $3,049,025 in restitution. *Id.* at 3, 7. Her term of supervised release is three years. *Id.* at 4.

While Ms. Crowe's offenses are serious, they are non-violent. They are also her first; Ms. Crowe has never been charged with any other crime. The Presentence Investigation Report ("PSR") notes that Ms. Crowe's criminal history score is zero, which places her in the lowest possible criminal history category (category I). Dkt. 17 ¶ 40.

The PSR also reduces Ms. Crowe's offense level for acceptance of responsibility, observing that she "assisted authorities in the investigation or prosecution of [her] own misconduct by timely notifying authorities of [her] intention to enter a plea of guilty." *Id.* ¶¶ 34, 35. She makes no excuses for her conduct, but explains that it began by helping others pay off their loans and snowballed from there.[4] She deeply regrets her actions and has resolved never to repeat her mistakes.[5] *Id.*

**B.      Prisons are breeding grounds for the coronavirus.**

Ms. Crowe's chances of contracting the coronavirus are far higher in prison than they would be at home. As judges across the country have recognized, prisons are "powder kegs for infection" that have allowed "the COVID-19 virus to spread with uncommon and frightening speed." *United States v. Rountree*, No. 12-CR-0308, 2020 WL 2610923, at *5 (N.D.N.Y. May 18, 2020) (citation omitted); *see also United States v. Young*, No. 16-40036, 2020 WL 2514673,

---

[4] Ex. 7 (Declaration of Lauren Pardee Ruben ("Ruben Decl.")), ¶ 4.
[5] *Id.*

at *2 (D. Mass. May 15, 2020) ("the virus can appear suddenly and spread quickly in the prison population").

Consider one prison: FCI Seagoville in Texas. On June 23rd, the prison had just two confirmed COVID-cases, as shown by a data-tracking project at the University of Iowa College of Law.[6] A week later: 89 cases. Two weeks: 418 cases. Three weeks: 893 cases.[7] As of August 13th, FCI Seagoville has had 1379 inmates infected.[8] The facility houses only 1,640 inmates, meaning an infection rate of 80%.[9] At least four people have died,[10] and no one knows how many more deaths are coming or how many more people will be left with lasting injuries.

FCI Seagoville isn't alone. The Federal Bureau of Prisons ("BOP") has confirmed 13,095 cases since the pandemic struck.[11] At least 118 prisoners have died.[12] There are confirmed active cases in 113 prisons and 39 halfway houses.[13]

These staggering numbers are confirmed more widely by the American Medical Association ("AMA"). In July, the AMA confirmed what has been clear for months: "COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the US population."[14] The AMA published a telling chart on the rate of coronavirus infection in

---

[6] Univ. of Iowa Coll. of Law, *Compassionate Release Work, Graphing Active COVID Cases in the BOP* (Aug. 13, 2020), https://bit.ly/3gkiPde (last visited Aug. 30, 2020).
[7] *See id.*
[8] *Id.*
[9] BOP, Locations: FCI Seagoville, https://www.bop.gov/locations/institutions/sea/ (last visited Aug. 30, 2020).
[10] BOP, COVID-19 Coronavirus (July 29, 2020), https://www.bop.gov/coronavirus/ (last visited September 14, 2020).
[11] *Id.* As of September 10, 2020, counsel reviewed the latest numbers, and BOP lists 1,772 inmates currently infected.
[12] *Id.*
[13] *Id.*
[14] Brendan Saloner, Ph.D., et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, J. Am. Med. Assoc. (July 8, 2020), https://bit.ly/3jD9PBZ.

prisons versus the wider population, and there is no dispute—prisons are vastly more dangerous:[15]



The researchers found that the infection "rate for prisoners was 5.5 times higher than the US population," and the death rate "in the prison population was 3.0 times higher."[16]

The Federal Defenders in the Southern District of New York are tracking daily numbers exclusively on the federal prison population, and those figures show an almost identical infection rate to that above—a 500% increase in federal prisons:[17]

---

[15] *Id.*
[16] *Id.*
[17] *See* Fed. Defs. of N.Y., *BOP-Reported COVID-19 Test Results Nationwide* (July 16, 2020), https://bit.ly/2DpAFNa.



COVID-19 Infections per 1,000 People

■ Bureau of Prisons ■ United States ■ China ■ Italy

62.43

10.50

0.06

3.90

Infections/ 1,000 People

Dr. Chris Beyrer, Professor of Epidemiology at John Hopkins, explains why prisons and

jails "are petri dishes"[18] propelling the spread of COVID-19:

- Adhering to social distancing guidelines is "virtually impossible";
- Adhering to proper decontamination of surfaces is "virtually impossible";
- Inmates have limited supply of basic hygiene products;
- There are too many shared spaces, including toilets, showers, and mess halls;
- There is not only a high turnover rate in the inmate population, but also staff mix with inmates and then return to their homes and back again.[19]

In light of these conditions, it is no surprise that the Washington Post's Editorial Board recently

observed that "[the] HIGHLY contagious coronavirus is ripping through jails and prisons across

the country, endangering more than 2 million Americans who are incarcerated, as well as

hundreds of thousands of correctional staff."[20] Notably, 10 of the top 10 infection clusters in the

---

[18] Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (May 20, 2020), https://nyti.ms/2yIBiQg.
[19] Ex. 1 (Declaration of Chris Beyrer ¶¶ 11–19, *United States v. Shehee*, No. 18-cr-6005-SMJ (D. Wash. Aug. 7, 2020), ECF No. 115-3).
[20] OpEd, *Coronavirus cases in prisons are exploding. More people need to be let out*, Wash. Post (Aug. 21, 2020), https://wapo.st/2QKv9bH.

United States (and 87 of the top 100) are linked to correctional facilities and detention centers.[21] The Editorial Board called for a reduction of the prison population as "the only meaningful way to slow the spread of the virus, protect medically vulnerable incarcerated people and reduce the threat of virus spread to nearby communities."[22]

The prison where Ms. Crowe is a tinderbox ready to spark a viral conflagration. Ms. Crowe is incarcerated at the Atwood SPC, a minimum-security satellite camp for female offenders adjacent to FMC Lexington.[23] Ms. Crowe is confined to a 230-sf space with four other women.[24] The building is a dormitory-style unit with about 150 inmates who share toilets, sinks, phones, and eating spaces; it is simply impossible to maintain a six-foot distance from other people.[25] The inmates lack adequate soap and other hygienic supplies.[26] Ms. Crowe rightly feels that she would be defenseless if the virus invaded the prison.[27]

---

https://www.washingtonpost.com/opinions/coronavirus-cases-in-prisons-are-exploding-more-people-need-to-be-let-out/2020/08/21/711b7b9a-e306-11ea-8dd2-d07812bf00f7_story.html.

[21] *Id.*

[22] *Id.*

[23] BOP, Locations: FMC Lexington, https://www.bop.gov/locations/institutions/lex/ (last visited Aug. 30, 2020).

[24] Ex. 7, ¶ 9.

[25] *Id.*; *cf.* Order Re: Plaintiff-Petitioners' Motion for Preliminary Injunction, and *Ex Parte* Application for Provisional Class Certification at 17, *Torres v. Milusnic*, No. 20-cv-4450 (C.D. Cal. July 14, 2020), ECF No. 45 ("The physical configuration of the facilities at Lompoc—i.e., dormitories, multi-person cells, open configurations, community restrooms, and units/rooms shared by 8-10 person rooms precludes meaningful social distancing."); Order Granting Motion Emergency Compassionate Release at 2, *United States v. Curington*, No. 12-cr-20115 (S.D. Fla. July 7, 2020), ECF No. 645 ("The virus presents a danger to senior inmates within correctional institutions. There is little ability to maintain social distance in confinement, and it is difficult—if not impossible—to practice other necessary behaviors, such as frequent hand washing to reduce the spread of the virus.").

[26] Ex. 7, ¶ 10.

[27] *Id.*, ¶ 11; *see also* Ex. 4 (8/31/2020 Declaration of Peter Crowe) ¶ 4.

Out of the 1,257 inmates at FMC Lexington,[28] there have been 287 confirmed cases of COVID-19 and eight deaths.[29] There are at least six confirmed active cases.[30] While the active case count is currently low (as far as we know), experience shows that the virus can quickly explode within prison walls. Indeed, as the Warden himself has warned inmates, "[t]here has been an increase in positive cases in the community and the virus could easily spread throughout the institution if we become complacent with our prevention efforts."[31]

### C. Ms. Crowe has an appropriate release plan.

If released, Ms. Crowe will reside in her home in Louisville, Kentucky. Counsel can provide the street address to the Court on request. She will share the residence with her husband, Peter Crowe, and her youngest daughter.[32] She will be able to self-isolate in her own room for at least fourteen days.[33] Mr. Crowe will support his wife financially and cover her on his health insurance plan.[34]

### DISCUSSION

This Court may reduce Ms. Crowe's sentence if (1) "extraordinary and compelling reasons warrant" reduction; and (2) the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The Commission set forth three specific categories qualifying as extraordinary and compelling: terminal medical conditions, medical debilitation, and family circumstances. U.S.S.G. § 1B1.13 Notes 1.(A)–(C).

---

[28] BOP, Locations: FMC Lexington, *supra* note 21. Information on COVID-19 cases is available only with respect to FMC Lexington as a whole, not with respect to Atwood SPC specifically.
[29] Ex. 2 (7/30/2020 Memo. from Francisco J. Quintana, Warden to Inmate Population ("Warden Memo.")); BOP, COVID-19 Coronavirus, *supra* note 8; Ex. 8 (9/3/2020 Warden Memo.).
[30] BOP, COVID-19 Coronavirus, *supra* note 8.
[31] Ex. 3 (7/2/2020 Warden Memo.).
[32] Ex. 7, ¶ 12; *see also* Ex. 4, ¶ 5. Ms. Crowe's youngest daughter (age 21) suffers from Turner Syndrome (*id.*) and would benefit from her mother's presence.
[33] Ex. 7, ¶ 12; *see also* Ex. 4, ¶ 5.
[34] Ex. 4, ¶ 7; *see also* Ex. 7, ¶ 12.

But recognizing that these categories might not encompass the wide range of extraordinary and compelling reasons, the Commission added a catch-all—"other reasons"—which may warrant compassionate release. *See* U.S.S.G. § 1B1.13, Note 1(D); *see also, e.g.*, *United States v. Stewart*, No. 98-40097-01, 2020 WL 4260637, at \*3–4 (D. Kan. July 24, 2020); *United States v. Adeyemi*, No. CR 06-124, 2020 WL 3642478, at \*9–14 (E.D. Pa. July 6, 2020).

A court may grant a sentence reduction "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A) (emphasis added).

## II. MS. CROWE HAS MET THE STATUTORY CLAIMS-PROCESSING REQUIREMENT.

More than 30 days have lapsed since Ms. Crowe requested a sentence reduction from the Warden at FMC Lexington. She requested compassionate release on April 27, 2020.[35] One month later, the Warden acknowledged receiving her request but failed to act on it.[36] Because more than 30 days have lapsed, this Motion is timely. *See, e.g.*, *United States v. Alam*, 960 F.3d 831, 833–36 (6th Cir. 2020); *United States v. Somerville*, No. 12-CR-225-NR, 2020 WL 2781585, at \*5 (W.D. Pa. May 29, 2020); *United States v. Haney*, No. 19-cr-541, 2020 WL 1821988, at \*3 (S.D.N.Y. Apr. 13, 2020); U.S. v. Harris, No. 20-1723 (3rd Cir.).

---

[35] Ex. 5 (4/27/2020 Letter from Crowe to Warden); Ex. 6 (5/28/2020 Response letter from Warden to Crowe).
[36] Ex. 6.

### III. MS. CROWE'S VULNERABILITY TO COVID-19 CONSTITUTES AN EXTRAORDINARY AND COMPELLING BASIS FOR SENTENCE REDUCTION.

Ms. Crowe suffers from multiple serious health problems. Each condition, on its own, greatly increases the risk of harm from COVID-19. Taken together, the compounding effects of each illness could cost Ms. Crowe her life if she is infected with the SARS-CoV-2 coronavirus.

#### A. Obesity increases the risk of death and severe disease from COVID-19.

*First*, Ms. Crowe is severely obese. Her last officially recorded weight, on April 15, 2020, was 224.8 pounds.[37] At 5 feet and 2 inches tall, her BMI was 41.1[38] According to the CDC, a BMI over 30 is "within the obese range," and a BMI of 40 or higher is "categorized as 'extreme' or 'severe' obesity." [39] Ms. Crowe's BOP doctors describe her obesity as "morbid."[40] While Ms. Crowe has lost weight in prison, her BMI is still over 30.[41]

The CDC lists obesity as a condition that "increase[s] [the] risk of severe illness from COVID-19."[42] The CDC's conclusion is supported by the "[s]trongest and most consistent evidence."[43] Indeed, one study of 4,103 COVID-19 patients in New York City found that the two "most important features" predicting hospitalization were obesity and age.[44]

---

[37] Ex. 9 (Excerpts of Medical Records) at MR-005. On January 29, 2020, it was 242.8 pounds (BMI 44.4). *Id.* at MR-010.

[38] *Id.* at MR-012.

[39] CDC, *Defining Adult Overweight & Obesity* (June 30, 2020), https://bit.ly/3fy6dhy.

[40] Ex. 9 at MR-001, MR-009, MR-010, MR-011.

[41] Ex. 7, ¶ 6; *see also* Ex. 4, ¶ 2.

[42] *See* CDC, *People with Certain Medical Conditions* (Aug. 14, 2020), https://bit.ly/3a3pCpj.

[43] *See* CDC, *Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19* (July 28, 2020), https://bit.ly/2Pbs4AH (citing Jennifer Lighter, et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, Oxford Clinical Infectious Diseases (Apr. 9, 2020), https://bit.ly/2PviB7d)) (additional citations omitted).

[44] Christopher M. Petrilli, et al., *Factors associated with hospitalization and critical illness among 4,103 patients with COVID-19 disease in New York City*, MedRxiv, preprint (Apr. 11, 2020), https://bit.ly/2DDkooj.

The DOJ "follow[s] the CDC's guidance in determining whether an 'extraordinary and compelling reason' exists."[45] At the end of July, the DOJ issued a new policy "interpreting the updated CDC" findings which broadened "the conditions the CDC states are risk factors, including obesity."[46] In light of the CDC's guidance, the DOJ conceded that a BMI "over 30 constitutes an extraordinary and compelling reason warranting a reduction [in] sentence."[47] In other words, both the CDC and DOJ agree: Ms. Crowe's obesity presents an extraordinary and compelling reason to reduce her sentence.

Consistent with CDC guidance and DOJ policy, numerous courts cite obesity and the threat of coronavirus as grounds for a sentence reduction. *See, e.g.*, Memorandum Opinion and Order at 8, *United States v. Boykin*, No. 14-cr-00201 (D.D.C. July 16, 2020), ECF No. 87 (granting sentence reduction where defendant "suffers from severe obesity"); *United States v. White*, No. 13-cr-20653-1, 2020 WL 2557077, at *1 (E.D. Mich. May 20, 2020) (granting sentence reduction where defendant "has two medical conditions—hypertension and obesity— that, in combination with one another, make him especially susceptible to a severe outcome (including death) if he contracts COVID-19"); *United States v. Sarkisyan*, No. 15-cr-00234, 2020 WL 2542032, at *2 (N.D. Cal. May 19, 2020) (granting sentence reduction where defendant suffers "hypertensive heart disease, chronic kidney disease, and obesity"); *United States v. Anderson*, No. 15-cr-30015, 2020 WL 2521513, at *1 (C.D. Ill. May 18, 2020) (granting sentence reduction and citing "health issues—hypertension, hyperlipidemia, and obesity—and the COVID-19 pandemic"); *United States v. Pomante*, No. 19-20316, 2020 WL 2513095, at *1

---

[45] Letter from Paul A. Riley to J. Hollander, *United States v. Cole*, No. 18-cr-167 (D. Md. July 30, 2020), ECF No. 95.
[46] *Id.*
[47] *Id.*

(E.D. Mich. May 15, 2020) (granting sentence reduction and citing "chronic kidney disease resulting from a 2016 bout with kidney cancer, hypertension, obesity, and diabetes").[48]

The vulnerability of obese prisoners to the ravages of COVID-19 is an extraordinary and compelling reason to reduce Ms. Crowe's sentence.

## B. Hypertension increases the risk of death and severe disease from COVID-19.

*Second*, Ms. Crowe suffers from hypertension, also known as high blood pressure.[49] Hypertension "increases [the] risk of serious health problems, including heart attack and stroke."[50] It can "quietly damage [the] heart, lungs, blood vessels, brain, and kidneys if it isn't treated."[51] "The latest evidence shows that people with uncontrolled or untreated high blood pressure may be at risk of getting severely ill with COVID-19."[52] Indeed, a report from Italy said that 76% of people who had died from COVID-19 had high blood pressure.[53]

---

[48] *See also United States v. Brooks*, No. 07-cr-20047, 2020 WL 2509107 (C.D. Ill. May 15, 2020); *United States v. Young*, 16-40036, 2020 WL 2514673 (D. Mass. May 15, 2020); *United States v. Handy*, No. 10-cr-128-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Cassidy*, No. 17-CR-116S, 2020 WL 2465078 (W.D.N.Y. May 13, 2020); *United States v. Barber*, No. 18-cr-00446, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ullings*, No. 10-cr-00406, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Foreman*, No. 19-cr-62, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Jenkins*, No. 99-cr-00439, 2020 WL 2466911 (D. Co. May 8, 2020); *United States v. Quintero*, No. 08-CR-6007L, 2020 WL 2175171 (W.D.N.Y. May 6, 2020). There are many more cases citing obesity that counsel can provide upon request.

[49] Ex. 9 at MR-001, MR-003 (prescription drugs for hypertension), MR-004 (same), MR-009, MR-010, MR016; *see also* Ex. 7, ¶ 6 and Ex. 4, ¶ 2.

[50] Mayo Clinic, *Diseases & Conditions: High blood pressure (hypertension)* (May 12, 2018), https://mayocl.in/3bpn8lN.

[51] WebMD, *Hypertension: Visual Guide to High Blood Pressure* at slide 2, https://wb.md/3hSsIiZ (last visited Sept. 2, 2020).

[52] Mayo Clinic, *COVID-19 and high blood pressure: Am I at risk?* (June 30, 2020), https://mayocl.in/2YXo2Rw; *see also* CDC, *Coronavirus Disease 2019 (COVID-19)* (Aug. 14, 2020), https://bit.ly/3jJa5OX (listing hypertension as a condition that might increase the risk of severe illness from COVID-19).

[53] WebMD, *Coronavirus and High Blood Pressure: What's the Link?* https://wb.md/2YW6R2D (last visited Sept. 2, 2020).

Given the risks of COVID-19 for inmates with hypertension, courts have regularly granted compassionate release to prisoners with the condition. *See, e.g.*, *United States v. Robinson*, No. 10cr261, 2020 WL 4041436, at *5 (E.D. Va. July 17, 2020) (finding extraordinary and compelling reason based solely on defendant's hypertension); *United States v. Salvagno*, No. 02-CR-51, 2020 WL 3410601, at *15 (N.D.N.Y. Apr. 23, 2020) (observing that "several peer-reviewed scientific studies and research commentaries in reputable scientific journals conclude that hypertension is independently associated with severe manifestations of COVID-19, controlling for the confounding variables of age and other health conditions"); *United States v. Pena*, No. 15-cr-551, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]"); *United States v. Soto*, No. 18-CR-10086, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020) ("Defendant's medical records show that he suffers from hypertension. This condition increases his risk for serious complications from contracting COVID-19, including death."); *United States v. Scparta*, No. 18-CR-578, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) (finding hypertension to be a comorbidity that increases the risk of death from COVID-19, and "reject[ing] the Government's contention that Mr. Scparta['s] general good health before the pandemic speaks to whether he should now be released"); *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851, at *3 (E.D.N.Y, Apr. 10, 2020) (granting compassionate release to a defendant convicted of possession of child pornography who suffers from hypertension).[54]

---

[54] *See also, e.g.*, *United States v. White*, No. 13-cr-20653-1, 2020 WL 2557077 (E.D. Mich. May 20, 2020); *United States v. Doshi*, No. 13-cr-20349, 2020 WL 2556794 (E.D. Mich. May 20, 2020); *United States v. Hill*, No. 19-cr-00038, 2020 WL 2542725 (D. Conn. May 19, 2020); *United States v. Copeland*, No. 02-cr-01120, 2020 WL 2537250 (E.D.N.Y. May 19, 2020); *United States v. Bright*, No. 15CR00015-005, 2020 WL 2537508 (W.D. Va. May 19, 2020); *United States v. El-Hanafi*, No. 10-CR-162, 2020 WL 2538384 (S.D.N.Y. May 19, 2020); *United States v. Anderson*, No. 15-cr-30015, 2020 WL 2521513 (C.D. Ill. May 18, 2020); *United*

Ms. Crowe's hypertension constitutes another extraordinary and compelling reason to extricate her from the petri dish of the prison environment.

### C. Asthma increases the risk of death and serious disease from COVID-19.

*Third*, Ms. Crowe has asthma.[55] Asthma is "a condition in which [the] airways narrow and swell and may produce extra mucus."[56] Symptoms of asthma include shortness of breath, chest tightness or pain, wheezing when exhaling, and "[c]oughing or wheezing attacks that are worsened by a respiratory virus . . . ."[57]

Ms. Crowe's asthma symptoms were well controlled before she was incarcerated; she used an inhaler only once or twice a year. Ex. 7, ¶ 7. In the dusty and moldy prison environment, however, her asthma has flared up. *Id.* She now uses two inhalers daily. *Id.* It is difficult for her to wear a cloth mask all day because of her asthma. *Id.*

Asthma is yet another risk factor for death or serious illness from COVID-19.[58] Courts have thus granted compassionate release to asthmatic inmates. *See, e.g.*, *United States v. Schneider*, No. 14-cr-30036, 2020 WL 2556354, at *5 (C.D. Ill. May 20, 2020) (granting compassionate release because asthma "increases the serious risks that COVID-19 presents for Defendant"); *United States v. Doshi*, No. 13-cr-20349, 2020 WL 2556794, at *3 (E.D. Mich. May 20, 2020) (granting compassionate release because "diabetes and asthma are both risk factors for all ages"); *United States v. Bright*, No. 15CR00015-005, 2020 WL 2537508, at *2

---

States v. Cotinola, No. 13-CR-03890, 2020 WL 2526717 (D.N.M. May 18, 2020); *United States v. Bennett*, No. 05 Cr. 1192-1, 2020 WL 2539077 (S.D.N.Y. May 18, 2020); *United States v. Johnson*, No. 15-cr-125, 2020 WL 3041923 (D.D.C. May 16, 2020). There are many more cases citing hypertension that counsel can provide upon request.

[55] Ex. 9 at MR-001, MR-002, MR-006, MR-007, MR-008, MR-009, MR-014, MR-016; Ex. 7, ¶¶ 6, 7; Ex. 4, ¶ 2.

[56] Mayo Clinic, *Diseases & Conditions: Asthma* (Aug. 11, 2020), https://mayocl.in/3jJjp5H.

[57] *Id.*

[58] *See* CDC, *Coronavirus*, *supra* note 50 (listing asthma as a condition that might increase the risk for severe illness from COVID-19).

(W.D. Va. May 19, 2020) (granting compassionate release where defendant "suffers from a number of pre-existing conditions that make him particularly vulnerable if he catches the coronavirus and develops Covid-19, chiefly his weakened heart after an August 2014 heart attack and his asthma").[59]

This Court should grant Ms. Crowe the same relief afforded many prisoners likewise suffering from asthma.

### D. Atrial fibrillation increases the risk of death and serious disease from COVID-19.

*Fourth*, Ms. Crowe suffers from atrial fibrillation.[60] "Atrial fibrillation is an irregular and often rapid heart rate that can increase [the] risk of strokes, heart failure and other heart-related complications."[61] "During atrial fibrillation, the heart's two upper chambers (the atria) beat chaotically and irregularly—out of coordination with the two lower chambers (the ventricles) of the heart."[62] "Atrial fibrillation symptoms often include heart palpitations, shortness of breath and weakness."[63]

---

[59] *See also, e.g.*, *United States v. Schafer*, No. 18-CR-06152, 2020 WL 2519726 (W.D.N.Y. May 18, 2020); *United States v. Lee*, 445 F. Supp. 3d 272 (N.D. Cal. 2020); *United States v. Brooks*, No. 07-cr-20047, 2020 WL 2509107 (C.D. Ill. May 15, 2020); *United States v. Young*, No. CR 16-40036, 2020 WL 2514673 (D. Mass. May 15, 2020); *United States v. Ennis*, No. 02-CR-01430, 2020 WL 2513109 (W.D. Tex. May 14, 2020); *United States v. Cassidy*, No. 17-cr-00116, 2020 WL 2465078 (W.D.N.Y. May 13, 2020); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Simpson*, No. 11-cr-00832, 2020 WL 2323055 (N.D. Cal. May 11, 2020); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States v. Echevarria*, Nos. 17-cr-44,06-cr-269, 2020 WL 2113604 (D. Conn. May 4, 2020). There are many more cases citing asthma that counsel can provide upon request.
[60] *See* Ex. 9 at MR-001, MR-007, MR-008, MR-009, MR-011, MR-016, MR-017; *see also* Ex. 7, ¶ 6 and Ex. 4, ¶ 2.
[61] Mayo Clinic, *Diseases & Conditions: Atrial fibrillation* (June 20, 2019), https://mayocl.in/2F1XJm0.
[62] *Id.*
[63] *Id.*

Before her incarceration, Ms. Crowe would take flecainide and baby aspirin to control her atrial fibrillation.[64] But she has not received either medication since arriving at the prison.[65]

The CDC has recognized that "[s]erious heart conditions" increase the risk of severe illness for COVID-19.[66] And courts have found that atrial fibrillation meets the definition of a "serious heart condition," thus warranting compassionate release in light of the COVID-19 pandemic. *See, e.g.*, *United States v. Hodges*, No. 04-CR-993-3, 2020 U.S. Dist. LEXIS 97259, at *6-7 (N.D. Ill. June 3, 2020) (finding the combination of atrial fibrillation and imprisonment in a hotspot facility creates an extraordinary circumstance sufficient for compassionate release); *United States v. Walker*, No. 11-cr-381, 2020 WL 4194677, at *4 (D. Minn. June 26, 2020) (concluding compassionate release was warranted because atrial fibrillation, a serious cardiac condition, is a confirmed risk factor for severe illness from COVID-19); *United States v. Ullings*, No. 10-cr-00406, 2020 WL 2394096, at *4 n.7 (N.D. Ga. May 12, 2020) (noting a "review in the Mayo Clinic Proceedings that notes a report issued by the Italian Ministry of Health showing 'the most common comorbidities in a cohort of 481 patients who died with COVID-19 were hypertension (74%), diabetes (34%), ischemic cardiopathy (30%), and atrial fibrillation (22%)'") (citation omitted).[67]

Ms. Crowe's atrial fibrillation is yet another extraordinary and compelling reason why she should not be left exposed to the onslaught of a deadly virus.

---

[64] Ex. 9 at MR-007, MR-011; Ex. 7, ¶ 8.
[65] Ex. 7, ¶ 8.
[66] CDC, *People with Certain Medical Conditions* (Aug. 14, 2020), https://bit.ly/3jJa5OX.
[67] *See also, e.g.*, *United States v. Arreola-Bretado*, 445 F. Supp. 3d 1154, 1158 (S.D. Cal. 2020); *United States v. Davis*, No. 15-CR-00062, 2020 WL 3443400, at *2 (E.D. Cal. June 23, 2020); *United States v. Lewellen*, No. 09-CR-0332 (-2), 2020 WL 2615762, at *4 (N.D. Ill. May 22, 2020); *United States v. Miller*, No. CR CCB-06-478, 2020 WL 4732129, at *3 (D. Md. Aug. 13, 2020).

*     *     *

Each of Ms. Crowe's medical conditions—obesity, hypertension, asthma, and atrial fibrillation—increase Ms. Crowe's vulnerability to COVID-19. Together, they present a potentially lethal combination. The combined risk of Ms. Crowe's multiple ailments constitutes an extraordinary and compelling circumstance warranting compassionate release.

## IV. MS. CROWE POSES NO DANGER TO THE PUBLIC OR THE COMMUNITY.

Ms. Crowe is a non-violent offender who acted, in part, as a deeply misguided Robin Hood. Now that she has learned her lesson, she poses no danger to the community that cannot be remedied via supervision. Notably, the DOJ has found that "[d]efendants released through the compassionate release program are less than a tenth as likely to recidivate as the average federal prisoner." *United States v. Osorto*, 445 F. Supp. 3d 103, 110 (N.D. Cal. 2020) (citing DOJ, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program 49–50 (2013) ("Inspector General Report")).[68]

The BOP's own model agrees. Under the First Step Act, the BOP must assign all prisoners a risk score based on a statistical model called *Prisoner Assessment Tool Targeting Estimated Risk and Need*, or PATTERN.[69] The BOP finds that Ms. Crowe falls in the low risk category.[70] That assessment makes sense. Ms. Crowe has no criminal history and no disciplinary infractions from her time in prison.[71] She is also almost 50 years old with a stable home and family waiting for her.

---

[68] The DOJ has also estimated that "broader use of compassionate release could save taxpayers millions and free desperately needed space in BOP facilities." *Id.* (citing Inspector General Report at 45–48). *Copeland*, 2020 WL 2537250, at *4.

[69] DOJ, *The First Step Act of 2018: Risk & Needs Assessment System* 1 (Jan. 2020), https://bit.ly/3ikErXD.

[70] Ex. 10 (4/15/2020 BOP Response memorandum to J. Crowe).

[71] Ex. 11 (8/17/2020 Inmate Discipline Data).

Any risk could be mitigated by imposing conditions of supervised release. The relevant statute allows this Court to "impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). The Court could thus impose a term of supervised release of up to ten years with whatever conditions the Court finds appropriate. Indeed, this Court's judgment already requires that, during the three years of supervised release following her sentence, Ms. Crowe must, among other things, (1) report to a probation officer; (2) inform her employer of her convictions if she holds any fiduciary position; (3) provide the probation officer with access to her financial information; and (4) refrain from incurring any new credit charges or opening any additional lines of credit without approval of the probation officer unless she is in compliance with her payment schedule. Dkt. 23 at 4–5 (Order of Judgment). These conditions, and any others the Court deems fit to impose, will minimize any potential risk of reducing Ms. Crowe's sentence. *See United States v. Delateur*, No. CR18-5364, 2020 WL 3989175, at *3 (W.D. Wash. July 1, 2020) (granting release for multiple-time child pornography offender found not a danger because "the risk of Delateur reoffending may be reasonable mitigated with strict conditions of immediate release as well as the [already] imposed lifetime of supervised release").

## V.     THE 3553 FACTORS FAVOR RELEASE.

The 3553 factors also favor release. In considering whether Ms. Crowe has received just punishment, it is important to emphasize that Ms. Crowe will not regain her full freedom. Rather, she will be governed by "conditions that substantially restrict [her] liberty." *Gall*, 552 U.S. at 48. She will also be subject to harsh consequences if she violates or reoffends. *See id.*

Moreover, keeping Ms. Crowe in prison serves no deterrent purpose. The National Institute of Justice, an arm of the DOJ itself, says that "[s]ending an individual convicted of

crime to prison isn't a very effective way to deter crime."[72] What deters crime is the "*certainty* of being caught," not the harshness of punishment: "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."[73]

The Government's best argument will be that Ms. Crowe has served less than a year of her sentence. And that is true. But many courts have granted sentence reductions to prisoners having served only small portions of their sentences. *See, e.g.*, *United States v. Prasad*, No. CR 19-71, 2020 WL 2850147, at *1 (E.D. La. June 2, 2020) (defendant served 8%, 2 months of a 24-month sentence); *United States v. Locke*, No. CR18-0132, 2020 WL 3101016, at *1 (W.D. Wash. June 11, 2020) (defendant served 10%, 6 months of a 62-month sentence); *United States v. Gonzalez*, No. 18-CR-0232, 2020 WL 1536155, at *1 (E.D. Wash. Mar. 31, 2020) (defendant served 10%, 1 month of a 10-month sentence); *United States v. Ben-Yhwh*, 2020 WL 1874125, at *2, *6 (D. Haw. Apr. 13, 2020) (defendant served 13%, 8 months of a 60-month sentence); *United States v. Barber*, No. 18-cr-00446, |2020 WL 2404679, at *1 (D. Or. May 12, 2020) (defendant served 14%, 8.5 months of a 60-month sentence); *United States v. Foreman*, No. 19-cr-62, 2020 WL 2315908, at *1 (D. Conn. May 11, 2020) (defendant served 17%, 2 months of a 12-month sentence); *United States v. Pena*, No. 16-10236, 2020 WL 2798259, at *1, *6 (D. Mass. May 29, 2020) (defendant served 18%, 6 months of a 32-month sentence); *United States v. Echevarria*, Nos. 17-cr-44, 06-cr-269, 2020 WL 2113604, at *1 (D. Conn. May 4, 2020) (defendant served 19%, 9 months of a 48-month sentence); *Delateur*, 2020 WL 3989175, at *1 (W.D. Wash. July 1, 2020) (defendant served 19%, 9 months of a 48-month sentence).[74]

---

[72] Nat'l Inst. of Just., *Five Things About Deterrence* (June 5, 2016), https://bit.ly/2XA9g2s.

[73] *Id.* (emphasis added).

[74] For more cases where defendants served less than half their sentences, *see, e.g.*: Emergency, Time-Sensitive Motion for Reconsideration, *United States v. Brown*, No. 2:18-cr-00360 (N.D. Ala. May 21, 2020), ECF No. 32 at *2 *and* Order (May 22, 2020), ECF No. 35 (defendant served

**CONCLUSION**

Ms. Crowe requests that the Court reduce her sentence and convert her remaining time to supervised release pursuant to 18 U.S.C. 3582(c)(1)(A)(i).

---

20%, 12 months of a 60-month sentence); *United States v. Gorai*, No. 18-CR-220, 2020 WL 1975372, at *1 (D. Nev. Apr. 24, 2020) (defendant served 21%, 12 months of a 57-month sentence); *United States v. Torres*, No. 19-cr-20342, 2020 WL 4019038, at *1, *4 (S.D. Fla. July 14, 2020) (defendant served 21%, 5 months of a 24-month sentence); *United States v. Rahim*, No. 16-20433, 2020 WL 2604857, at *1 (E.D. Mich. May 21, 2020) (defendant served 22%, 16 months of a 72-month sentence); *United States v. Atkinson*, No. 19-CR-55, 2020 WL 1904585, at *1 (D. Nev. Apr. 17, 2020) (defendant served 22%, 6 months of a 27-month sentence); *United States v. Delgado*, No. 18-cr-17, 2020 WL 2464685, at *2 (D. Conn. Apr. 30, 2020) (defendant served 24%, 29 months of a 120-month sentence); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *1, *5 (E.D. Mich. Apr. 20, 2020) (defendant served 25%, 1 months of a 4-month sentence); *United States v. Young*, No. CR19-5055, 2020 WL 2614745, at *1, *4 (W.D. Wash. May 22, 2020) (defendant served 25%, 15 months of a 60-month sentence); *United States v. Common*, No. 17-cr-30067, 2020 WL 3412233, at *1 (C.D. Ill. June 22, 2020) (defendant served 28%, 33 months of a 120-month sentence); *United States v. Bayuo*, No. 15-cr-576, 2020 WL 3415226, at *1 (S.D.N.Y. June 20, 2020) (defendant served 28%, 10 months of a 36-month sentence); *United States v. Jackson*, No. 18-cr-86, 2020 WL 3396901, at *1, *2 (N.D. Ind. June 19, 2020) (defendant served 28%, 24 months of an 87-month sentence); *United States v. Gileno*, No. 19-cr-161, 2020 WL 1916773, at *1 (D. Conn. Apr. 20, 2020) (defendant served 29%, 3.5 months of a 12-month sentence); *Loyd v. United States*, No. 15-20394, 2020 WL 2572275, at *1 (E.D. Mich. May 21, 2020) (defendant served 29%, 35 months of a 120-month sentence); *United States v. Pabon*, No. 17-165-1, 2020 WL 2112265, at *1 (E.D. Pa. May 4, 2020) (defendant served 30%, 14 months of a 46-month sentence); *United States v. Grubbs*, No. CR16-228, 2020 WL 3839619, at *1 (W.D. Wash. July 8, 2020) (defendant served 31%, 33 months of a 108-month sentence); Memorandum Order, *United States v. Winston*, No. 13-cr-00639 (D. Md. Apr. 28, 2020), ECF No. 294 at * 2, *7 (defendant served 30%, 36 months of a 120-month sentence). There are many more cases that support sentence reduction that counsel can provide upon request.

DATED:  September 15, 2020          **PERKINS COIE LLP**


By:*/s/ Lauren Pardee Ruben*
    Lauren Pardee Ruben, Bar No. 52683
    Counsel
    Perkins Coie LLP
    1900 Sixteenth Street Suite 1400
    Denver, CO 80202-5255

    Counsel for Defendant


149393590.2