UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                         PLAINTIFF

v.                                      CRIMINAL ACTION NO. 3:19-cr-00095-DJH

JOSEPHINE CROWE                                                  DEFENDANT

### RESPONSE TO CROWE'S SECOND MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)
*Filed Electronically*

Defendant Josephine Crowe first moved the Court to reduce her sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) in September 2020. (DN. 33.)  Following detailed briefing by both the defendant, with the aid of counsel, and the government, the Court denied this motion in December 2020.  (DN. 42.)  Crowe has now again moved the Court for compassionate release and/or release to home confinement[1] due to her medical conditions, the coronavirus pandemic, and her fear that she will contract the virus and suffer complications.  (DN 43.)  The Court should deny this motion because Crowe has not demonstrated that there are extraordinary or compelling reasons justifying her release and because her early release would violate nearly all the sentencing factors outlined in Title 18, United States Code, Section 3553(a).

---

[1] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review).

<u>BACKGROUND</u>

I.      Crowe's Underlying Criminal Conduct and Sentence of Imprisonment

The facts underlying Crowe's conviction are the same as summarized in the government's response to Crowe's first motion for compassionate release. (*See* DN. 36.)   In short, Crowe embezzled funds from the Louisville Metro Police Officer's Credit Union (the "Credit Union") over a period of years to such an egregious extent that it ultimately caused not only the collapse of the financial institution but also resulted in significant harm to over a hundred individual members of the Credit Union.

From January 2013 to November 2017, Crowe engaged in a long-running scheme to defraud the Credit Union, of which she was the Vice President, of over $3 million.  (DN 18, Presentence Investigation Report at ¶ 11.)  Specifically, Crowe used the access to the Credit Union's funds and information granted to her by virtue of her position as Vice President to devise and execute a scheme to steal cash from the Credit Union's vault and teller drawers, to transfer Credit Union funds into accounts belonging to herself and certain of her family members, and to make payments on certain unwitting Credit Union members' loans with Credit Union funds that did not belong to the members for whose benefit they were credited.  (*Id*. at ¶ 12.)  Crowe further engaged in various deceptive methods in order to compensate for the depletion of cash that she stole from the Credit Union and knowingly misused the means of identification of many members of the Credit Union in order to do so.  (DN 18, Presentence Investigation Report at ¶¶ 12-15.)

Crowe's scheme to defraud had dramatic consequences.  In December 2017, the Credit Union was placed into conservatorship by the National Credit Union Association ("NCUA") and considerable efforts were undertaken to untangle the defendant's scheme, address the harms it caused, and correct the operational weaknesses the defendant had created at the Credit Union.  (DN

2

18, Presentence Investigation Report at ¶ 17.)  Ultimately, as a result of the scheme, the Credit Union suffered catastrophic losses, was rendered insolvent with no prospect for restoring viable operations, and had to be liquidated by the NCUA.  (*Id*.)  Due to fraudulent activity within their accounts as a result of defendant Crowe's criminal conduct and other record keeping errors, 247 member accounts had to be written off by the NCUA for a loss to the NCUA of almost $3.9 million.  (*Id*. at ¶ 17.)  There were also well over 100 individual victims who suffered harm as a result of Crowe's long-running scheme.  (*Id*. at ¶ 18.)

In May 2019, Crowe was charged by Information with one count of financial institution fraud, in violation of Title 18, United States Code, Section 1344, and one count of aggravated identity theft, in violation of Title 18, United States Code, Section 1028A.  (DN 18, Presentence Investigation Report at ¶¶ 1-2.)  In July 2019, Crowe pled guilty to both counts of the Information pursuant to a written plea agreement with the government.  (*Id*. at ¶¶4-8.)  In November 2019, Crowe was sentenced to 132 months of imprisonment.  (DN 23.)  Crowe surrendered to the Bureau of Prisons ("BOP") to begin serving her term of imprisonment in January 2020.  (*See* DN 27, Order denying motion to extend time to self-surrender, entered January 7, 2020.)

Crowe, now 49 years old, is serving her sentence at FMC Lexington, a federal medical center with an adjacent minimum security satellite camp, Atwood Camp, located in Lexington, Kentucky.  (*See* Exhibit A, Inmate Data.)[2]  Crowe is currently residing at the Atwood Camp facility.  As of the filing of this response, Crowe has served only approximately 32 months of her 132-month sentence.  (*Id.*)

Relevant to this attempt to seek compassionate release, Crowe submitted a letter of request seeking compassionate release from the Warden of FMC Lexington on November 2, 2021.  (*See*

---

2 The United States has filed all Exhibits to this Response under seal due to the nature of their content.

DN 43, Exhibit 1.)  The Warden denied this request on November 30, 2021. (*Id.*) Crowe appears to have again submitted a request seeking compassionate release on the same basis from the Warden in December 2021.  (*Id.*)  The Warden denied Crowe's second request on January 28, 2022.  (*Id.*)  On August 4, 2022, Crowe filed the present motion with this Court seeking early release due to her medical conditions and the coronavirus pandemic.  (DN 43.)  The government agrees that more than 30 days have passed since her requests to the Warden, and that she therefore has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

II.      BOP's Response to Crowe's Medical Needs and the COVID-19 Pandemic

During her time in custody, Crowe has been under treatment by medical personnel at FMC Lexington for certain health conditions.  As evidenced by her medical records, BOP personnel have previously and continue to evaluate and treat Crowe's medical conditions, which include obesity, hypertension, atrial fibrillation, and asthma. (*See* Exhibit B, Medical Records).  During her time at FMC Lexington, BOP medical personnel have issued and filled prescription medications to treat Crowe's conditions and have authorized other treatments and medical procedures for Crowe including appointments and procedures with specialists at the University of Kentucky Medical Center. (*Id.*).

In May 2022, Crowe underwent a successful surgical ablation procedure to address her atrial fibrillation.  (*See* Exhibit B, Medical Records).  According to BOP doctors, two more procedures followed in July 2022 to ensure there were no complications: a chest CT completed to rule out an atrioesophageal fistula and a head MRI to rule out acute intracranial problems.  Both tests were negative, and a follow up visit resulted in some additional medication changes as well as a follow up plan to monitor Crowe for any potential recurrence of atrial fibrillation.  (*See also, id.*)  According to BOP doctors, Crowe is designated a Medical Care Level 1, the lowest

designation of medical care in the federal BOP system, reserved for inmates with limited medical needs, as her conditions are considered stable, well-managed, and controlled. *See* BOP Clinical Guidance, Care Level Classification, available at https://www.bop.gov/resources/pdfs/ care_level_classification_ guide.pdf  (last visited September 9, 2022).

Crowe's surrender date to the BOP was nearly contemporaneous to the emergence of COVID-19 as a global pandemic.  From that moment on, the COVID-19 pandemic became a significant health and safety concern for the BOP, just as it is for institutions across the world. As the Court is aware, from the outset the BOP made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization.  BOP's "action plan" is described in detail at www.bop.gov/coronavirus/.  Under the current plan, BOP continues to collaborate with the CDC to further evaluate and evolve BOP Operational Levels in a manner to provide the least amount of disruption to visiting and institution programming while maintaining the highest level of protection to staff and inmate patients against COVID-19.

BOP's aggressive efforts have extended to FMC Lexington.  BOP medical personnel have detailed significant measures in place at FMC Lexington in keeping with BOP's "action plan" and specific safety measures that have been implemented with both the staff and inmate population to minimize the spread of the COVID-19 virus.  These measures include education regarding behavioral and hygiene modifications and guidelines, reduced in person contact and distancing, the provision of face coverings, sanitization measures, and other health and safety protocol as outlined by BOP.  Significant to these measures is the fact that COVID-19 vaccine and boosters are now widely available at BOP facilities, including at FMC Lexington, and education and medical counseling relating to the vaccines are provided by BOP medical staff.   According to

BOP medical personnel, as of September 6, 2022, there are no inmates at the Atwood camp, where defendant Crowe resides, who are reported positive for COVID-19, and only one inmate reported positive for COVID-19 at the FMC Lexington medical center which houses male inmates.

Crowe has herself contracted COVID-19 twice.  According to BOP medical personnel and Crowe's medical records, Crowe tested positive first in December 2020 and then again in December 2022.  (*See* Exhibit B, Medical Records.)  In both instances that Crowe contracted COVID-19, she was isolated, monitored, and treated by medical personnel as her symptoms warranted.  (*Id.*)  Crowe was treated with prescribed Tylenol, and daily oxygen saturations, temperature measurements, and screenings were ordered during the isolation period. (*Id.*)  Her medical records reflect and BOP doctors report that Crowe did not suffer severe illness either time she was diagnosed with COVID-19 and she remained designated a Medical Care Level 1 during and after each illness.  (*Id*.)  Crowe did report an increased frequency of episodic atrial fibrillation in the time following her first case of COVID-19, which led BOP medical personnel to increase monitoring of that concern, adjust medications, and they continued to take steps to treat her atrial fibrillation, including the successful surgical ablation procedure described above.  (*Id*.)  Despite these encounters with the virus, Crowe has refused the COVID-19 vaccine.[3]  (*See* Exhibit C, Immunization Record; DN 43 at pageID #413.)

ARGUMENT

A court may only grant compassionate release based on an individual defendant's "extraordinary and compelling reasons," which the defendant has the burden of showing.  *See United States v. Hunter*, 12 F.4th 555, 561 (6th Cir. 2021).  In addition, a court must consider the

---

3 Crowe's medical records indicate that Crowe refused other vaccines and preventative care screenings in 2020 and 2021 in addition to the COVID-19 vaccine.

factors set forth in 18 U.S.C. § 3553(a) and determine that the "defendant is not a danger to the safety of any other person or to the community."  18 U.S.C. § 3582(c)(1)(A); USSG §1B1.13.

In considering motions for compassionate release, district courts engage in a three-step inquiry: (1) "the court must 'find' that 'extraordinary and compelling reasons warrant [a sentence] reduction,'" (2) "ensure 'that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission,'" and (3) "consider[ ] all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. Elias*, 984 F.3d 516, 518 (6th Cir. 2021).  Congress has tasked the Sentencing Commission with defining "extraordinary and compelling." 28 U.S.C. § 994(t).  The Commission, however, defined that phrase before Congress enacted the First Step Act, which first gave defendants the right to move the district court to reduce their sentences under § 3582(c)(1)(A).  In USSG §1B1.13, the Commission defined "extraordinary and compelling reasons" to include medical conditions, age, and status as a caregiver. *Elias*, at 518. In a fourth category, the Commission deferred to the Bureau of Prisons to define "other reasons." *Id*.  The Sixth Circuit has ruled that, because the Commission has not amended §1B1.13 since the First Step Act went into effect, §1B1.13 does not apply to motions defendants directly file (as opposed to motions the Bureau of Prisons files, which the statute still allows). *Id*. at 519.

The Sixth Circuit has now said that "district courts have discretion to define 'extraordinary and compelling' on their own initiative" when an imprisoned person files a motion for compassionate release. *Elias*, 984 F.3d at 519-20.  But under any definition, "extraordinary and compelling" has its limits.  "'[D]iscretion' does not mean 'whim'" and "[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement." *United States v. Jones*, 980 F.3d 1098, 1112 (6th Cir. 2020) (citing *United States v. Keefer*, 832 Fed. Appx. 359, 363 (6th Cir. 2020)).  The compassionate-release statute does not permit "a sort

of Wild West" or allow "every district judge [to] hav[e] an idiosyncratic release policy." *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (also holding that §1B1.13 does not apply to prisoner-filed § 3582(c)(1)(A) motions). "The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons.'" *Id*. Thus, "the Commission's analysis can guide discretion without being conclusive." *Id*.

As § 3582(c)(1)(A) says, a defendant's reasons for release must be "extraordinary"—meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). They must also be "compelling"—meaning "so great that irreparable harm or injustice would result if the relief is not granted." Sapp, 2020 WL 515935, at *3 (internal quotation and alteration omitted). And they must "warrant such a reduction." 18 U.S.C.§ 3582(c)(1)(A)(i).

I.    <u>The Coronavirus Pandemic Is Not a Basis for Compassionate Release In This Case</u>.

Crowe argues that she suffers from medical conditions—obesity, hypertension, atrial fibrillation, and asthma—that put her at a higher risk of complications from COVID-19. The government does not dispute that Crowe presents certain risk factors, as confirmed in her medical records. (*See* Exhibit B, Medical Records.) However, the conditions Crowe suffers from all appear to be well-managed and controlled through treatment by BOP Health Services at the present time. (*Id*.) Crowe has received significant attention to her medical needs from both BOP doctors and medical personnel and outside caregivers at University of Kentucky Medical Center.

While the government agrees that certain of Crowe's chronic medical conditions are ones that the CDC has identified as increasing the risk of severe illness from COVID-19, Crowe's fear

of suffering severe effects from exposure to COVID-19 has been belied by the fact that she has previously contracted the virus (twice), tolerated it without exhibiting any severe symptoms, and recovered to her previous level of health, continuing to be designated as a BOP Medical Care Level 1.  The large majority of courts to address the matter have concluded that compassionate release is not justified on the basis of the risk of severe COVID-19 disease following recovery from the virus, even before vaccination. *See, e.g.*, *United States v. Sookdeo*, 851 F. App'x 263, 264-65 (2d Cir. 2021) ("We also agree with the government's argument below (apparently endorsed by the District Court) that the risk of reinfection Sookdeo asserts is too speculative and unlikely to constitute an extraordinary and compelling reason."); *United States v. Andrews*, 2020 WL 7714708, at *4 (D. Nev. Dec. 29, 2020) ("it is highly unlikely Andrews will be reinfected, and speculative that reinfection would lead to significantly more serious symptoms than she has already experienced." *see also, e.g.*, *United States v. Jenkins*, 2021 WL 665854, at *4 (S.D. Ind. Feb. 19, 2021) ("To date, this Court has declined to find extraordinary and compelling circumstances warranting a sentence reduction when a defendant has recovered from COVID-19—even when that defendant has risk factors for severe symptoms. . . . The fact that the BOP is now actively vaccinating inmates against COVID-19 . . . only underscores the speculative nature of any concern about reinfection.").

Moreover, despite her purported concerns about contracting COVID-19, Crowe has refused the COVID-19 vaccine. (*See* Exhibit C, Immunization Record.)  A "prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an 'extraordinary and compelling' justification for release." *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021); *see also United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) ("if an inmate does not present a compelling reason justifying the failure to be vaccinated despite

access to the vaccine, a district court would abuse its discretion by granting a motion seeking a sentence reduction under § 3582(c)(1)(A)(i) on the grounds that COVID-19 constitutes an extraordinary and compelling justification"); *United States v. Baeza-Vargas*, 2021 WL 1250349, at *2–3 (D. Ariz. Apr. 5, 2021) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") (citing more than a dozen cases). Despite noting concerns with the COVID-19 vaccine in her motion, Crowe has not offered any compelling reason justifying her failure to be vaccinated. At one point in her correspondence with the Warden at FMC Lexington, Crowe stated that she had refused the vaccine due to her unspecified religious beliefs. (*See* DN 43-1 at PageID #438, Exhibit 1 to Crowe's Motion, November 2021 Request to Warden for Compassionate Release.) Crowe has, however, discarded that rationale in her current motion, arguing instead that she has unaddressed safety concerns with the COVID-19 vaccine. (DN. 43 at PageID #413.) According to BOP medical personnel, the COVID-19 vaccine continues to be offered monthly to inmates at FMC Lexington in a clinic setting, is available at various other times as well, and medical staff is available to provide education and discuss the vaccine with inmates during appointments, clinics, or at other times. Crowe has chosen not to avail herself of any of these options for education, discussion, or vaccination.

Once a vaccine is available to an inmate—even when that vaccine has been rejected, as here—compassionate release is not warranted based on the threat of COVID-19 alone. *See United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) ("a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling reason' warranting a sentence reduction); *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) ("[F]or the vast majority of prisoners, the

availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release."); *United States v. Reed*, 2021 WL 2681498, at *4 (E.D. Pa. June 30, 2021) (Schmehl, J.) ("Now that COVID-19 vaccinations are being administered throughout the Bureau of Prisons, compassionate release motions [based on COVID-19] generally lack merit.").  In sum, absent a significant change in the current scientific assessment regarding the efficacy of the vaccines and treatments for COVID-19, the advent of widespread vaccine availability and improved treatments should bring to an end the unprecedented period in which compassionate release has been available based on the threat of the virus.  Instead, sentence reductions based on medical conditions once again should be limited to extraordinary conditions that are terminal or severely limit an inmate's ability to function in a correctional setting. *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (relief is "rare" and "extraordinary"); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) ("[A] defendant's medical condition must be one of substantial severity and irremediability."). At present, Crowe does not present any such condition as her medical conditions are well-treated and controlled at FMC Lexington and do not diminish her ability to provide self-care or provide any other basis for release.

## II.    Relief is Improper Considering the Factors Set Forth in 18 U.S.C. § 3553(a).

Even when a defendant is statutorily eligible for a sentence reduction based on an "extraordinary and compelling reason[]," compassionate release is not necessarily appropriate. Before ordering relief, courts must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the "defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13.  Here the same factors that advocated the denial of defendant's 2020 motion for compassionate release direct the same result now.  Considering the catastrophic

and expansive nature of Crowe's long-running fraud scheme, and its impact on not only the financial institution but well over one hundred individual victims, it would run counter to virtually every 18 U.S.C. § 3553(a) factor to release Crowe when she has served less than 25% of her 132-month sentence.  (*See* Exhibit A regarding percentage of statutory and full time served.) The analysis of these factors remains much the same as it was in October 2020, as Crowe's crimes were extremely serious, harmful, and multifaceted; her history and characteristics reflect participation in a long-running scheme and failure to fully accept responsibility and the magnitude of the wrongs she perpetrated; and she still has served only a small percentage of her overall sentence of incarceration.

To revisit certain of these factors, the "nature and circumstances" of the defendant's crimes weigh against relief given the extremely serious nature of the offense.  18 U.S.C. § 3553(a)(1). Crowe perpetuated a complex, multifaceted fraud scheme to embezzle from the Credit Union that ultimately resulted in the collapse of the entire financial institution.  Her scheme also caused significant harm to the Credit Union's many members, as her theft and misuse of their personal information resulted in problems with the members' credit histories and ratings and thus, in some instances, their ability to make and pursue future financial decisions.  Crowe also engaged in a variety of sophisticated deceptions in the course of her long-running scheme, including aggravated identity theft, check kiting, doctoring and manipulating official financial records, and unabashed lying to the members of the community for whom she professed to care.

The defendant's "history and characteristics" likewise do not support relief.  18 U.S.C. § 3553(a)(1).  Though Crowe has no other criminal history, the criminal conduct in this case was not a singular, isolated mistake but rather involved a multifarious scheme that Crowe carried on over the course of more than four years and her obstructive and uncooperative conduct continued

beyond the scheme itself.  After she was caught, Crowe engaged in significant efforts to conceal her fraudulent activity, making it even more difficult for the Credit Union to untangle and repair the financial disarray created by her fraudulent scheme and false financial record keeping.  (DN 18, Presentence Investigation Report at ¶ 16.)  These post-discovery actions reflect a defendant more concerned with hiding and minimizing her misdeeds than taking responsibility for her conduct and righting the wrongs that she had wrought.  Crowe's evasion continued even to the point of sentencing in this case, when she did not fully and adequately cooperate in the financial investigation required under the terms of her plea agreement, failing to provide a timely and complete financial disclosure form listing all of her assets and financial interests to the United States.  (*See* DN 19.)  Such conduct once again reflected on Crowe's failure both to accept responsibility for her actions and to grasp the magnitude and impact of her crimes.  Ultimately, as a result, Crowe did not receive the full reduction for acceptance of responsibility under USSG §§ 3E1.1(a) and (b) at sentencing.  (*See* DN 23, 24.)

Reducing Crowe's sentence by what would now be approximately 75% would further fail to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for this serious offense.  18 U.S.C. § 3553(a)(2)(A). Nor would such a reduction provide adequate deterrence to criminal conduct, either specific or general, or protect the public from further crimes of this defendant.  18 U.S.C. § 3553(a)(2)(B) and (C).  It would also serve to magnify unwarranted sentencing disparities with similarly situated defendants.  18 U.S.C. § 3553(a)(6).  As such a sentencing reduction stands counter to the factors in 18 U.S.C. § 3553(a), compassionate release would be improper in this case and should not be granted.  S*ee*, *e.g.*, *United States v. Pawlowski*, 967 F.3d 327 (3d Cir. 2020) (though inmate was eligible for consideration due to medical conditions, district court did not abuse its discretion in concluding that release, after only 19

months of a 180-month term for public corruption, was not warranted under the 3553(a) factors;
the court properly relied on the limited time served, the seriousness of the crime (political
corruption), and the sentencing disparity with a co-defendant's sentence that would result if the
defendant were released), *affirming United States v. Pawlowski*, 2020 WL 2526523, at *4 (E.D.
Pa. May 18, 2020); *United States v. Kibble*, 2020 WL 3470508, at *3 (S.D.W.V. June 25, 2020)
("the vast majority of district courts have likewise declined to grant compassionate release motions
where a defendant has served a small fraction of his or her sentence of incarceration"); *United
States v. DiMartino*, 2020 WL 2307648 (D. Conn. May 8, 2020) (release denied for 66 year old
defendant with heart disease and diabetes who served only 35% of 70 month sentence); *United
States v. Spencer*, 2020 WL 3047439 (N.D. Ohio June 8, 2020) (without deciding whether
supraventricular tachycardia is a CDC risk factor, release denied as defendant served only 55
months of a 151 month sentence); *United States v. Hasan-Hafez*, 2020 WL 2836782, at *5
(S.D.N.Y. June 1, 2020) ("it would undercut the § 3553(a) factors to allow Mr. Hasan-Hafez to
serve just 13 months of a 45 month sentence"); *United States v. Doty*, 2020 WL 3440948, at *3
(S.D.W. Va. June 23, 2020) (relief denied even though inmate is medically vulnerable and at
institution with outbreak, because release after serving less than a third of a 42-month sentence,
imposed for fraud committed while superintendent of schools, would be inappropriate); *United
States v. Rivera*, 2020 WL 3547938 (D. Haw. June 30, 2020) (relief denied even though defendant
suffered from hyperlipidemia, hypertension, asthma, and obesity, where defendant, who stole
millions from university where he was chief financial officer, had served only 2½ years of 115-
month sentence).

Releasing Crowe after she has served approximately 32 months of her 132-month sentence on the basis of compassionate release under the circumstances presented here would contradict the sentencing factors listed in 18 U.S.C. § 3553.

## CONCLUSION

The Court should deny defendant Crowe's motion for compassionate release or release to home confinement.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

*Stephanie M. Zimdahl*

_____
Stephanie M. Zimdahl
Assistant U.S. Attorney
717 West Broadway
Louisville, Kentucky  40202
PH:  (502) 582-6217
FAX: (502) 582-5067

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record in this case.

I further certify that I mailed the foregoing document, along with the notice of electronic filing, by first class mail to the following non-CM/ECF participant:

FMC LEXINGTON,
FEDERAL MEDICAL CENTER
SATELLITE CAMP
P.O. BOX 14525
LEXINGTON, KY  40512
Attn: Josephine Crowe, # 20017-033

*Stephanie M. Zimdahl*

_____
Stephanie M. Zimdahl

15